AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

NOV 1 2011

U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Samsung Galaxy Note 5, Model SM-N920N | ) |
| FCC ID A3LSMN920P/ DEC: 25669158400525243S | ) |
| CURRENTLY LOCATED AT DEA Evidence Locker | ) |
| 6715 Little River Turnpike, Annandale, Virginia 22003 | ) |

Case No. 1:17-SW-736
Under Seal

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the ___Eastern District___ District of ___Virginia___, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, (a) & 846 | Conspiracy to Distribute Cocaine |

The application is based on these facts:

SEE AFFIDAVIT.

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

| Lena Munasifi |
|---|

*Applicant's signature*

TaskForceOfficer Marcos Herrera, Drug Enforcement Administration
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/1/17

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

The Honorable Theresa C. Buchanan, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

The property to be searched is a Samsung Galaxy Note 5, Model SM-N920P cellular phone, FCC ID: A3LSMN920P/DEC: 256691584005252435 (hereinafter "the Device"). The Device is currently located in a DEA evidence locker at 6715 Little River Turnpike, Annandale, Virginia.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

18

## **ATTACHMENT B**

1.      All records on the Device, described in Attachment A, that relate to violations of the Federal Criminal Code involving controlled substances and Antonio Alonzo JETT ("JETT"), including:

  a.  any conversations, whether through text messages or other applications, where JETT discusses cocaine or any other controlled substance;

  b.  lists of customers and related identifying information;

  c.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

  d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

  e.  any information recording JETT's schedule to the date the Device came into law enforcement possession;

  f.  any photographs of controlled substances; and

  g.  all bank records, checks, credit card bills, account information, and other financial records.

  h.  records of Internet Protocol addresses used; and

  i.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including

19

any form of computer or electronic storage and any photographic form.

      2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

20

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

NOV 1 2017

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF | |
| | UNDER SEAL |
| Samsung Galaxy Note 5, Model SM-N920P FCC ID A3LSMN920P/ DEC: 256691584005252435 | No. 1:17-sw-736 |
| CURRENTLY LOCATED AT DEA Evidence Locker 6715 Little River Turnpike, Annandale, Virginia 22003 | |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Marcos Herrera, Task Force Officer of the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Detective with the Town of Vienna Police Department (VPD).  I have been employed as a police officer with the VPD since 2013.  I have been assigned as a detective to the Criminal Investigation Section since 2016.  I am currently assigned to the DEA High Intensity Drug Trafficking Area Task Force located in Annandale, Virginia as a Task Force Officer.  I have been assigned to HIDTA Group 10 since September 2016.

3.     As a narcotics investigator, I have investigated violations of federal and state narcotic laws.  I have conducted criminal investigations and participated in narcotic investigations resulting in the arrest of drug distributors, and the seizure of quantities of controlled substances. These investigations have dealt with the distribution of drugs and illegal controlled substances.  I have received training in drug identification, drug distribution methods, and drug enforcement techniques from both state and federal agencies.   As a result, I am familiar with the use, effects, distribution techniques, appearance, and method of manufacture of controlled substances, including cocaine, crack cocaine, and marijuana.  I have participated in the execution of state and federal search warrants in the Eastern District of Virginia and the District of Maryland in search of illegal narcotics, paraphernalia related to the use of illegal narcotics, monies or proceeds derived from the sale of narcotics, and records, ledgers and documents pertaining to the purchase and sale of controlled substances.

4.     I know that it is common for individuals engaged in the distribution of controlled substances to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the distribution of narcotics, illegal proceeds of narcotics trafficking, and other efforts of co-conspirators.  I know that individuals engaging in the distribution of controlled substances use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and in direct telephone conversations.

5.     I know that it is common for narcotics traffickers to utilize multiple mobile telephones to communicate with co-conspirators in order to compartmentalize their illegal activity and avoid detection by law enforcement.  Additionally, I am aware that narcotics traffickers utilize

2

fictitious names, vehicles, and real property to circumvent law enforcement. I know that "smart" phones play an integral role in the daily lives of individuals engaging in the distribution of controlled substances and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations.

6.      The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from federal, state and local law enforcement officers, and information obtained from interviews and analysis of reports.

7.      This affidavit contains information necessary to support probable cause for the requested warrant. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

<u>IDENTIFICATION OF THE DEVICE TO BE EXAMINED</u>

8.      The property to be searched is a Samsung Galaxy Note 5, Model SM-N920P FCC ID: A3LSMN920P/DEC: 256691584005252435 (hereinafter referred to as "the Device"). The Device is currently located in a DEA evidence locker at 6715 Little River Turnpike, Annandale, Virginia 22003, within the Eastern District of Virginia.

9.      The applied-for warrant would authorize a forensic examination of the Device (Attachment A) for the purpose of identifying electronically stored data specifically described in Attachment B.

<u>PROBABLE CAUSE</u>

10.     On July 21, 2017, a criminal complaint was issued in the Eastern District of Virginia by the Honorable John F. Anderson, charging ANTONIO ALONZO JETT with

conspiracy to distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (1:17-MJ-336).

11.     Law enforcement officers have utilized a cooperating source of information (hereafter referred to as "CS-1") during this investigation.   Regardless of gender, CS-1 will be referred to in the masculine gender.  CS-1 has been proven to be reliable and credible through his use by law enforcement officers.  CS-1 has provided information in the past that has proven to be truthful.  The information that CS-1 has provided in this investigation has been corroborated through various investigative techniques.  CS-1 has a criminal history that includes convictions for driving while intoxicated, possession of marijuana, and possession of controlled paraphernalia. CS-1 is hoping to receive consideration for a pending state drug charge that is expected to formally be brought after this investigation concludes.   CS-1 is not being financially compensated for cooperation with law enforcement or for expenses incurred.  CS-1's information concerning JETT has been corroborated through physical surveillance, electronic surveillance, information obtained from various law enforcement and public databases, the investigation itself, and subpoenaed toll records.  CS-1's information has never been found to be false or misleading.  For these reasons, I consider CS-1 to be reliable.

12.     In March 2017, the Drug Enforcement Administration (DEA) and the Virginia State Police (VSP) began an investigation targeting the criminal activities of ANTONIO ALONZO JETT (hereinafter JETT) with the use of CS-1, who was familiar with JETT.  Investigation revealed JETT conspired with KIMESHA BRENT (hereinafter BRENT), and others, known and unknown, to distribute cocaine within the Eastern District of Virginia.

4

13.     In January 2017, CS-1 was investigated as a target of a drug investigation in Spotsylvania County, within the Eastern District of Virginia.  Spotsylvania County detectives had a confidential informant, who purchased a quantity of cocaine from CS-1.  A controlled purchase of cocaine was conducted at CS-1's residence, located in Spotsylvania County, within the Eastern District of Virginia.  As a result, a search warrant was executed at CS-1's residence.  A consent search was also conducted on CS-1's vehicle.  Approximately 12 grams of cocaine were seized from the vehicle.  DEA took custody of the cocaine recovered from CS-1's stash vehicle.  A sample of the cocaine field tested positive for the presence of cocaine.  The evidence was submitted to the Mid-Atlantic Laboratory in Maryland.  The laboratory results determined that the seized powered substance was cocaine.

14.     CS-1 subsequently cooperated with law enforcement.  CS-1 advised that the cocaine seized by law enforcement from CS-1's vehicle, and the cocaine sold during the controlled purchase, were supplied to CS-1 by "Tony."  Law enforcement showed a photograph of Antonio Alonzo JETT to CS-1, who positively identified the photograph as "Tony."  CS-1 further provided that he communicates with JETT through JETT's cellular telephone number of 571-268-7816 (the Device).  Administrative subpoenas revealed the subscriber for telephone number 571-268-7816 is Sonya STROTHERS.  A photograph of STROTHERS was shown to CS-1 by law enforcement and he positively identified STROTHERS as one of JETT's girlfriends.

15.     CS-1 has known JETT for approximately one year.  Shortly after the introduction, CS-1 began purchasing distribution quantities of cocaine directly from JETT.  CS-1's interactions or communications with JETT were conducted for the sole purpose of purchasing cocaine and

being supplied with distribution amounts of cocaine. CS-1 routinely purchased half-ounce (14 gram) quantities from JETT, every two weeks, for approximately one year.

16.     CS-1 advised that at some point during the course of their cocaine relationship JETT introduced his girlfriend, BRENT, to CS-1. CS-1 would communicate with JETT through JETT's telephone for the purchase of cocaine, and on several occasions, JETT would send BRENT to meet with CS-1 and deliver the cocaine to CS-1, instead of JETT performing the transaction himself. JETT, however, controlled the cocaine transactions by way of determining the price, the deal locations, the time of the deal, and who [JETT or BRENT] would meet CS-1 for the cocaine transaction.

17.     Analysis of JETT's toll records through administrative subpoenas reveal cellular telephone number 540-848-2847 as a frequent communicator. Administrative subpoenas of cellular number 540-848-2847 reveal BRENT as the sole subscriber. Cellular telephone number 540-376-4886 is also a frequent communicator with JETT. Administrative subpoenas of cellular number 540-376-4886 reveal STROTHERS as the sole subscriber.

18.     CS-1 advised that he met JETT or BRENT in the areas of Stafford and Fredericksburg, Virginia, within the Eastern District of Virginia, to purchase the cocaine. CS-1 advised that he has also purchased cocaine from JETT at JETT's residence located at 100 Picadilly Lane, Stafford, Virginia, within the Eastern District of Virginia. CS-1 stated that JETT was aware that CS-1 resided and re-distributed the quantities of cocaine, purchased from JETT, in the Eastern District of Virginia.

19.     From March 2017 through April 2017, law enforcement conducted two (2) controlled purchases of cocaine from JETT with the assistance of CS-1. In each transaction, CS-

6

1 was searched for drugs and contraband prior to each transaction with negative results. In both controlled purchases, CS-1 contacted JETT via documented text messages, and JETT would dictate a meet location.  JETT would then send his girlfriend, BRENT, to the deal location to deliver cocaine to CS-1.  Directly after each transaction with JETT, CS-1 transferred custody of the cocaine to law enforcement. Immediately after each drug transaction CS-1 was debriefed regarding the details of the meeting with BRENT, and the suspected cocaine was taken from CS-1 as evidence.  The substances obtained from BRENT field tested positive for the presence of cocaine.  The cocaine evidence was then transported to the DEA HIDTA office, processed and taken to the DEA laboratory for further testing. The laboratory test results show that the white powdered substance, obtained during both controlled purchases, was cocaine.

20.     Through the use of CS meetings and purchases, electronic surveillance, physical surveillance, and toll analysis, investigators established that JETT was in contact with BRENT during the aforementioned investigative time period.

### JETT Arrest and Seizure of the Device

21.     JETT was in possession of the Device at the time of his arrest and claimed ownership of the telephone.  On April 18, 2017, members of the DEA and VSP executed a state residential search warrant at 100 Picadilly Lane, Apartment 201, Stafford, Virginia. JETT and BRENT were both located inside of the apartment. JETT was arrested on outstanding probation violation warrants.

22.     During the search law enforcement agents located a quantity of cocaine, marijuana, and drug paraphernalia, to include packaging materials, scales, Inositol [a known cutting agent for the distribution of cocaine], and U.S. currency.  A firearm was also located within proximity to

7

JETT. JETT was Mirandized by law enforcement agents and verbally waived his right to counsel before being interviewed.

23.     JETT advised law enforcement agents that the all items located, to include the cocaine, marijuana, and the firearm, recovered during the execution of the search warrant belonged to him. All items were found in the master bedroom where JETT was arrested. The cocaine was seized from the inside a pocket of JETT's jacket, and the marijuana was seized from the master bedroom closet.

24.     The firearm was located inside a small safe, which was also found in the master bedroom closet. The firearm was later inspected and found to have an obliterated serial number. Before law enforcement opened the safe, JETT stated that a .40 caliber firearm was located within the safe. JETT further stated under Miranda that the firearm belonged to him, and he had obtained it from a subject he knew as "Joe," approximately eight months prior. JETT stated that he had traded "Joe" three and a half grams of cocaine for the firearm. JETT believes "Joe" obtained the firearm during a burglary. JETT acknowledged he is a convicted felon and is prohibited from having a gun.

25.     During the execution of the search warrant, BRENT was also interviewed by law enforcement. BRENT was Mirandized by law enforcement agents and verbally waived her right to counsel before being interviewed. BRENT advised law enforcement agents that she delivers cocaine, crack cocaine, and marijuana to four of JETT's customers under the direction of JETT. Law enforcement agents attained written consent from BRENT to search her phone, cellular telephone number 540-848-2847, while in her presence. Text messages between BRENT and

8

JETT, labeled as "My hubby 571-268-7816,"(the Device) show the following text message conversation on February 19, 2017:

> BRENT [540-848-2847]: Hotel Door
>
> JETT [571-268-7816]: Jen is coming out..long blonde
>
> BRENT [540-848-2847]: Hurry up
>
> BRENT [540-848-2847]: Blown

BRENT was asked by law enforcement agents to explain this conversation. BRENT advised that JETT was coordinating a drug sale and directed her to meet "Jen." JETT provided BRENT with a description of "Jen."

Another recovered text message conversation between BRENT and JETT on February 17, 2017 reads:

> JETT [571-268-7816]: Open the door
>
> JETT [571-268-7816]: Yo
>
> JETT [571-268-7816]: Walmart
>
> BRENT [540-848-2847]: K

BRENT explained that in this text message conversation, JETT was again directing her to a "Walmart" to conduct a drug sale for him.

A text message conversation between BRENT and JETT on February 11, 2017 reads:

> JETT [571-268-7816]: Yea

9

BRENT [540-848-2847]: In store

BRENT [540-848-2847]: Nelson??

JETT [571-268-7816]: Go to garden

BRENT explained that JETT was directing her to meet "Nelson" to conduct a drug sale that he was coordinating.

26.     BRENT advised law enforcement agents that she only acted under JETT's direction. BRENT did not have any knowledge as to how to package cocaine or other drugs. BRENT also stated to law enforcement agents that she and her child rely on JETT's income from illegal drug transactions for financial stability. BRENT stated that JETT only provides her with money from sales when she would ask him.  A text message conversation between her and JETT, undated, reads as follows:

BRENT [540-848-2847]: What do u want for dinner??

BRENT [540-848-2847]: What u say… I don't touch your shit!! I come to you, Stop doing that to me. I have no reason to steal from my man… I ask u for whatever I need.

BRENT [540-848-2847]: Plus I can't tie like you, so there is no way I touch anything… And you saw where I had the keys.

BRENT explained to law enforcement agents that JETT had accused her of stealing money from JETT, which is obtained from illegal drug transactions they conduct. BRENT also explained that

10

she does not weigh the drugs, nor knows how to package or tie the bags containing the cocaine or other sold drugs.

## USE OF CELLULAR TELEPHONES/STORAGE MEDIA BY DRUG TRAFFICKERS

27.     Based on my training, experience, and participation in narcotic and drug-related investigations, and my knowledge of this case, I know that:

        a. It is common for individuals engaged in the distribution of controlled substances to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the distribution of narcotics, illegal proceeds of narcotics trafficking, and other efforts of co-conspirators;

        b.  Individuals engaging in the distribution of controlled substances use cellular telephones and cellular telephone technology to communicate and remain in constant contact with customers and the sources of those controlled substances;

        c.  Individuals who engage in the distribution of controlled substances use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging and instant messaging in addition to direct telephone conversations.  It is also common for narcotics traffickers to send photographs and videos as exchange of information with customers and/or source(s) of supply; and

        d.  Individuals who engage in the distribution of controlled substances frequently maintain information, personal records, photographs, and documents in an electronic format on computers and/or smart phones.

Indeed, as described above, JETT coordinated drug transactions with BRENT and CS-1

11

through telephonic contact.

## TECHNICAL TERMS

28.     Based on my training and experience, I use the following technical terms to convey the following meanings:

     a.   *Wireless telephone*:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include:  storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

     b.   *Digital camera*:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.   Digital cameras use a variety of fixed and removable storage media to store their recorded images.   Images can usually be retrieved by connecting the camera to a computer or by connecting the

removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly

13

available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f. *IP Address*: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP

14

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29.   Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at www.samsung.com, I know that the Devices could have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

31.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

15

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. *Nature of examination.* Based on the foregoing, and consistent with Rule

16

41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33.     *Manner of execution.*   Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

34.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Marcos A. Herrera
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on this 1st day of November 2017:

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa C. Buchanan
United States Magistrate Judge

17

## ATTACHMENT A

The property to be searched is a Samsung Galaxy Note 5, Model SM-N920P cellular phone, FCC ID: A3LSMN920P/DEC: 256691584005252435 (hereinafter "the Device").   The Device is currently located in a DEA evidence locker at 6715 Little River Turnpike, Annandale, Virginia.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.      All records on the Device, described in Attachment A, that relate to violations of the Federal Criminal Code involving controlled substances and Antonio Alonzo JETT ("JETT"), including:

      a.  any conversations, whether through text messages or other applications, where JETT discusses cocaine or any other controlled substance;

      b.  lists of customers and related identifying information;

      c.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      e.  any information recording JETT's schedule to the date the Device came into law enforcement possession;

      f.  any photographs of controlled substances; and

      g.  all bank records, checks, credit card bills, account information, and other financial records.

      h.  records of Internet Protocol addresses used; and

      i.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage and any photographic form.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

20